VANDERHOFF LAW GROUP
Alan Vanderhoff, Cal. Bar No. 138032
Jeanne C. Vanderhoff, Cal. Bar No. 138011
750 B Street, Suite 1620
San Diego, California  92101
Telephone: (619) 299-2050

Attorneys for MI ARBOLITO, LLC

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| In re: | ) BK. No. 08-04553-LT11 |
| | ) |
| MI ARBOLITO, LLC, | ) DISCLOSURE STATEMENT TO DEBTOR'S |
| | ) FIRST AMENDED PLAN OF |
| Debtor. | ) REORGANIZATION DATED APRIL 10, 2009 |
| | ) |
| | ) <u>Confirmation Hearing Date</u> |
| | ) |
| | ) Date:    September 18, 2009 |
| | ) Time:    10:00 a.m. |
| | ) Dept.    Three |
| | ) Judge:   Hon. Laura S. Taylor |
| | ) |

MI ARBOLITO, LLC, debtor and debtor-in-possession in the above-captioned bankruptcy case (the "Debtor") is providing this Disclosure Statement to each known holder of a Claim or Interest in the Debtor for the purpose of soliciting acceptances of its Plan of Reorganization Dated April 10, 2009 (the "Plan")[1] and to enable Creditors to make an informed decision with regard to voting on the Plan.  A copy of the Plan is attached hereto as Exhibit "A."

## I.   INTRODUCTION

The purpose of this Disclosure Statement is to provide holders of claims against or interest in the Debtor with adequate information to enable them to make informed judgments about the Plan before exercising their right to vote for acceptance or rejection of the Plan.

---

[1]    Many terms, capitalized and otherwise, used in this Disclosure Statement, are defined in the Plan. You should consult the Plan for those definitions.

Acceptance or rejection of the Plan is important and must be made in writing.  An acceptance or rejection of the Plan may only be made by completing the Ballot that accompanies the Plan and mailing it to:

> Alan Vanderhoff, Esq.
> Vanderhoff Law Group
> 750 "B" Street, Suite 1620
> San Diego, California 92101

In order for a vote to be counted, the completed Ballot must be received no later than 5:00 p.m. Pacific Time, August 21, 2009.The Disclosure Statement describes the business background of the Debtor, the events that preceded the filing of this chapter 11 case, and summarizes the terms of the Plan. If the Plan is confirmed by the Court, it will bind all creditors and interest holders regardless of whether an individual claimant voted for or against the Plan and regardless of whether that claimant filed a proof of claim or interest.

The Debtor strongly urges that each recipient carefully and completely review the contents of this Disclosure Statement and the Plan.  Particular attention should be given to the provisions of the Plan affecting or impairing the rights of each holder of a Claim or Interest.  The information contained in this Disclosure Statement has been submitted by the Debtor, unless specifically stated to be from other sources.  The Debtor has authorized no representations concerning it or its financial affairs, other than those set forth herein.

The Plan is summarized below under the heading "Summary of the Plan," but all summaries are qualified by the terms of the Plan itself, which are in all instances controlling.  You may not rely upon this Disclosure Statement for any purpose other than to determine how to vote on the Plan.  Nothing contained in the Plan or Disclosure Statement shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtor or any other party.

The statements contained in this Disclosure Statement are made as of the date hereof, unless another time is specified herein.  Neither delivery of this Disclosure Statement nor any exchange of rights made in connection with the Disclosure Statement or the Plan shall under any circumstances create an implication that there has been no change in the facts set forth herein after the date the Disclosure Statement was prepared.  Although the Debtor believes that the contents of this Disclosure Statement are complete and accurate to the best of its knowledge, information and belief, the Debtor is unable to warrant or represent that the information contained herein is without any inaccuracy.

After notice and a hearing held on July 1, 2009, and upon the request of the Debtor, the Court, pursuant to Section 1125 of the Bankruptcy Code, approved this Disclosure Statement as containing information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of Debtor and the condition of its books and records, that would enable a hypothetical reasonable investor, typical of the Debtor's creditors and shareholders, to make an informed judgment to vote to accept or reject the Plan.  Approval of this Disclosure Statement by the Court does not, however, constitute a recommendation by the Court to accept or reject the Plan.

This is a liquidation plan.  Under the Plan, the Debtor's assets will be liquidated and the proceeds will be distributed to the creditors in the order of their priority. The Debtor believes that confirmation of the Plan is in the best interests of creditors.  The Debtor recommends that investors and creditors vote to accept the Plan.

## II. BACKGROUND INFORMATION

### A. Description of the Debtor, the Property, and Reason for Bankruptcy.

The Debtor owns a 14 story, luxury condominium development located at 3415 6th Avenue, on the corner of 6th Avenue and Upas Street in the City of San Diego (the "Property"). The Property has 14 condominium suites, one per floor. Each condominium is approximately 2280 square feet. When the bankruptcy case was filed on May 27, 2008, the project was about 90% completed. Work on the project had stopped in February of 2008 due to lack of funds. The only assets that the Debtor owns other than the Property are the proceeds from the post petition loan (see below). Loan proceeds in the amount of $65,688 were deposited with the Department of Real Estate in order to collateralize obligations of the Debtor to pay regular and special assessments levied by the homeowner's association against the units still owned by the Debtor. If the Debtor fails to perform its obligation to pay assessments, the homeowner's association shall have the right to draw on the funds to satisfy unpaid assessments. Upon full and final performance by the Debtor of its obligations to pay assessments and upon the sale of 80% of the units, any unused funds will be returned to the Debtor.

The Debtor borrowed money for the construction of the project from Point Center Financial. The loan was secured by a deed of trust on the Property. The loan was originally contemplated to be in the amount of $13,625,000. However, by a letter dated October 18, 2007, Point Center Financial stated to the Debtor that it was unable to raise the $1,606,387.50 necessary to fully fund the loan. The Debtor had been in negotiations with Point Center Financial for a new loan that would have enabled it to complete the construction and begin selling the Units. However, by a letter dated October 19, 2007, Point Center Financial broke off those negotiations and stated that it would not make a new loan on the Property. The Debtor attempted to obtain additional loans from other lending sources, but was unable to obtain additional financing.

Point Center Financial commenced foreclosure proceedings. On February 1, 2008, Point Center Financial recorded a Notice of Default and Election to Sell commencing a foreclosure under its deed of trust. On or about May 2, 2008, Point Center Financial recorded a Notice of Sale against the Property. The sale was scheduled to be conducted on May 28, 2008.

The Debtor was unable to negotiate a consensual resolution of its dispute with Point Center Financial. The Debtor believed that the value of the Property was far greater than the amount owed to Point Center Financial. Accordingly, the Debtor filed a voluntary petition under chapter 11 of the United States Bankruptcy Code on May 27, 2008 in order to halt the foreclosure sale and to reorganize for the benefit of its creditors and equity holders.

### B. Debtor's Claims Against Point Center Financial.

On October 25, 2008, the Debtor filed a lawsuit against Point Center Financial stating claims for fraud, interference with economic advantage, breach of contract, and equitable subordination. Among other things, the Debtor alleged that by August of 2007, the project was 80% completed and that the Debtor had purchasers committed to purchase three of the fourteen units. The Debtor believed that the value of the property as that time was approximately $30 million. On August 14, 2007, the Debtor requested the final draw of the construction loan. For a period of more than 60 days, Point Center Financial repeatedly told the Debtor that it would fund the final draw request and that the Debtor should continue completing the construction at full speed. Then, in October of 2007, Point Center Financial suddenly and unexpectedly refused to fund the final draw request. The Debtor further alleges that Point Center Financial's actions were inequitable because Point Center Financial was causing the Debtor to

3

increase the value of Point Center Financial's collateral at the expense of the Debtor, the subcontractors, suppliers, and other creditors. The misconduct of Point Center Financial resulted in injury to competing claimants and gave Point Center Financial an unfair advantage. The competing claimants continued to provide goods and services based on the assurances from Point Center Financial that it would fund the remainder of the loan. The misconduct of Point Center Financial resulted in Point Center Financial's collateral becoming more valuable at the expense of the competing claimants who remain unpaid. Among other relief requested, the Debtor has asked the Bankruptcy Court to equitably subordinate Point Center Financial's lien to the liens and interests of the other secured and unsecured creditors of the Debtor.

Point Center Financial disputes the above allegations and asserts that it did nothing wrong. Point Center Financial alleges that its actions were excusable because its loan documentation provided for the refusal to fund the final $1 million. Point Center Financial further alleges "the Debtor was in breach under the terms of the Point Center loan due to adding to the construction budget by at least $3 million without obtaining Point Center's consent." The Debtor disagrees with Point Center's position.

The Official Mechanic's Lienholder Committee has asserted that the Debtor has a conflict of interest with regard to prosecuting the claims against Point Center Financial because the Debtor's principals guaranteed the Point Center Financial loan. The Committee has advanced the argument that "Any reduction of the liability of the Debtor for the amount outstanding under the loan may result in an increase in personal liability for the principals." The Debtor disagrees with this analysis. To the extent that the Debtor has claims against Point Center Financial that can be set off against the Debtor's liability to Point Center Financial, the reduction in liability will benefit first the other creditors in the case and secondarily the Debtor's equity holders (to the extent that there is value that will flow to the equity security holders). The interests of the Debtor's principals and the unsecured creditors are aligned in that regard.

The Debtor believes that the position taken by the Committee regarding the prosecution of the claims against Point Center Financial might be a prelude to an attempt by the Committee to take over control of the Point Center Financial lawsuit. However, the Debtor believes that control of the Point Center Financial lawsuit by the Committee would be wholly inappropriate.

Unlike a committee of unsecured creditors which represents creditors with the lowest distribution priority, the Mechanic's Lienholder Committee represents the interests of secured creditors with liens that are either in first or second priority position. The claims against Point Center Financial should be used to reduce the claim of Point Center Financial thereby benefitting all classes of creditors, secured and unsecured alike. However, the Mechanic's Lienholder Committee would be tempted to use the claims to further their own personal interests at the expense of all other classes of creditors. There is a dispute between the Mechanic's Lienholder Committee and Point Center Financial regarding the relative priority of their liens. The Mechanic's Lienholder Committee would be tempted to sell-out the other classes of creditors and the equity holders by trading the lender liability claims for a higher lien priority than they might be legally entitled to. This scenario presents a true conflict of interest because the interests of the mechanic's lien holders are in direct conflict with the interests of the other creditors in the case. The Debtor believes that the Mechanic's Lienholder Committee would be ineligible to prosecute the lender liability claims.

In conjunction with the granting of a motion by the Debtor to approve post-petition financing, the Bankruptcy Court ordered that the Debtor's lawsuit against Point Center Financial will be stayed until either the post-petition loan is repaid or the Bankruptcy Court enters an order lifting the stay.

4

The Debtor's claims against Point Center Financial are preserved under the Plan including the Debtor's request for the equitable subordination of Point Center Financial's lien. The Debtor intends to pursue the claims for the benefit of the estate's creditors and equity holders. The Debtor's claims against Point Center Financial can be resolved in a number of ways including: (1) the stay can be lifted and the Debtor will pursue its claims after the Plan is confirmed, or (2) the Debtor and Point Center Financial could enter into a settlement of the claims, subject to Bankruptcy Court approval after notice to creditors.

C. Lien Priority Dispute.

A dispute currently exists between Point Center Financial and the holders of mechanic's liens regarding the priority of their respective liens. The priority of a deed of trust is typically established by the date on which the deed of trust was recorded with the San Diego County Recorder's office. The priority of a mechanic's lien typically relates back to the date of the first work of improvement on the project. All mechanic's liens typically have the same priority with regard to each other. Construction lenders typically ensure that the priority of the deed of trust securing their loan is in first priority by recording their deed of trust prior to any work being performed on the project by contractors or subcontractors.

In the case of the Debtor's Property, work on the project began long before Point Center Financial recorded its deed of trust. Extensive excavation was performed on the Property. However, most of the work on the project ceased for a long period of time due to a lawsuit that was filed by an unrelated party. There was some activity on the Property during the time of relative inactivity including such things as pumping water from the excavation, maintaining fencing, etc. Thereafter, Point Center Financial recorded its deed of trust and construction recommenced in earnest.

The Debtor believes that the position of the holders of mechanic's liens is that their liens relate back to the first work of improvement and that the first work of improvement was the excavation. If that is correct, the mechanic's liens would be prior in time to the lien of Point Center Financial's deed of trust and, accordingly, in first lien position on the Property. The Debtor believes that the position of Point Center Financial is that (1) cessation of work was a constructive completion of the project which ended the original work of improvement, (2) the activities on the Property during the time of relative inactivity was insufficient to prevent the constructive completion of the original work of improvement, (3) when the construction recommenced after Point Center Financial recorded its deed of trust it was a new work of improvement, and (4) the mechanic's liens only relate back to the new work of improvement. If Point Center Financial is correct, its deed of trust would be in first priority position.

The Plan does not purport to resolve this dispute. The Debtor has encouraged both sides to enter into an agreement for a pro rata distribution of the sale proceeds, rather than litigate the lien priority issue. Ultimately, the parties will have to arrive at an agreement or the Bankruptcy Court will have to decide the priority issue.  If the Bankruptcy Court decides the priority issue it may do so either as part of the plan confirmation process or through an adversary proceeding filed by the Debtor or some other interested party.

In summary, the priority dispute may be resolved in a number of different ways. This includes (1) the parties do nothing and Point Center Financial will be treated under the Plan as the holder of the senior lien, (2) the mechanic's lien holders (or their committee) may object to confirmation of the Plan on the grounds that the mechanic's liens should be given a higher priority than Point Center Financial, in which case the Bankruptcy Court may decide the priority issue as part of the hearing on the confirmation of the Plan, (3) the parties can agree between themselves as to how the sale proceeds will be divided

between them, or (4) the parties may commence an adversary proceeding in the bankruptcy court to determine the priority of the respective liens.

D. Stop Notice Claims.

Some holders of mechanic's liens also assert stop notice claims against Point Center Financial. Under California law, under certain circumstances, a subcontractor on a construction project can serve a notice on a construction lender to pay them directly from any remaining loan proceeds. If there are undisbursed loan proceeds and the subcontractor has satisfied all of the procedural requirements, the lender is required to withhold loan proceeds sufficient to pay the claim of the stop notice claimant.

The stop notice claimants in the Mi Arbolito case were granted relief from the automatic bankruptcy stay to pursue those claims against Point Center Financial in state court. The trial on the stop notice claims is scheduled for February 19, 2010. The Plan does not separately classify the claims of stop notice claimants. To the extent that the stop notice claimants prevail and obtain payment from Point Center Financial prior to being paid under the Plan, Point Center Financial will be subrogated to the claims that they paid.

E. Avoidance Actions.

The bankruptcy laws provide that certain transactions that occurred prior to a bankruptcy case being filed can be avoided or set aside. There are various kinds of avoiding powers including the power to recover preferential payments that were made to creditors just prior to a bankruptcy case being filed, the power to set aside transfers of property that were made with the intent to defraud creditors or for less than reasonably equivalent value, and the power to avoid unperfected liens or liens that were perfected during the 90-day preference period. The Debtor does not believe that there are any potential avoidance actions in this case.

F. Adversary Proceedings.

Currently, the only adversary proceeding that is pending is the lawsuit filed by the Debtor against Point Center Financial discussed above. It is possible that other adversary proceedings might be filed, however, it is not known at this time if other adversary proceedings will be filed. Issues that might require additional adversary proceedings would include the lien priority between Point Center Financial and the mechanic's lien holders and mechanic's liens that are disputed, if any, and for which a mechanic's lien holder did not file a proof of claim.

G. Post Petition Financing and Completion of the Building.

When the Debtor's bankruptcy case was filed, the Debtor's condominium building was only partially completed. The Debtor brought a motion before the Bankruptcy Court for the approval of a post-petition loan in an amount sufficient to pay for the completion of the building. The motion sought the approval of a loan in the approximate amount of $4.2 million secured by a super-priority lien on the Debtor's property. The motion was opposed by Point Center Financial.

The motion was approved by the Bankruptcy Court by an order entered on December 23, 2008. Following the entry of the order, the loan was fully documented and closed on or about January 15, 2009. The lender was United Development Land Opportunity Fund, L.P. ('United Development').

The post-petition loan was in the original principal amount of $4,422,000. It is secured by a first-priority lien on the Debtor's assets. The post-petition loan bears interest at the rate of 16%. The maturity date of the loan is January 15, 2010. The loan includes an interest reserve in the amount of $675,200 which will be used to pay the interest on the loan during the term of the loan.

6

When Units are sold, United Development will release its lien on a unit upon the receipt of seventy-five percent (75%) of the net sale proceeds. The remaining twenty-five percent (25%) of the net sale proceeds will be retained by the Debtor in a segregated account and held for the benefit of Point Center Financial and the holder's of mechanic's liens pursuant to the terms of the order approving the loan.

Work on the building commenced immediately after funding of the post petition loan. The building was substantially completed in May 2009.

H. Motion to Increase the Post Petition Financing Amount.

The Debtor might file a motion to borrow an additional $212,366 from United Development on the same terms as the post-petition loan. This represents an increase of approximately 5% over the original loan amount.

Some additional construction items need to be completed (although the remaining items are not a condition to obtaining a certificate of completion). The cost of the uncompleted items is estimated to be approximately $47,893. Part of the need for additional funds arose from the Department of Real Estate requiring the Debtor to deposit into escrow the sum of $65,688 to cover any HOA expenses. The Debtor had not expected that the DRE would require the deposit and had not budgeted for it. Other items that the additional loan proceeds would be used for include: (1) future real property taxes in the amount of $65,000, (2) insurance in the amount of $15,937, (3) U.S. Trustee's fees in the amount of $12,350, and (4) various items for maintenance during the next six months.

The Debtor does not expect to file the motion for additional funds until after it is in contract for the sale of the first unit.

I. Insider and Affiliate Claims.

The unsecured claims against the estate include a claim in the amount of $607,000 by 1700 Investors, LLC. 1700 Investors is a member of the Debtor and, therefore, an insider.

### III. SUMMARY OF THE PLAN

A. Introduction.

This Disclosure Statement contains a brief summary of the Plan and is qualified in its entirety by the full text of the Plan itself, a copy of which is attached hereto as Exhibit "A."  All terms defined in the Plan have the same meaning in this Disclosure Statement unless otherwise stated.  The Plan, if confirmed, will be binding upon the Debtor, the creditors and interest holders.  All creditors and interest holders are urged to carefully read the Plan

B. Overall Summary.

This is a liquidating plan. The Debtor will sell the units in its 14-story condominium building and disburse the sale proceeds to creditors. The proceeds will be distributed first to secured creditors in the order of their lien priority (or as otherwise directed by the Bankruptcy Court). The proceeds will then be disbursed to unsecured creditors in accordance with priorities established by the Bankruptcy Code. Property remaining after payment of creditors, if any, will be revested in the reorganized Debtor. The amount to be received by any particular creditor or class of creditors will depend upon that creditor's lien priority, the total amount of the claims in that creditor's class or in senior classes, and the total sale proceeds received by the Debtor.

C.  Classification and Treatment of Claims.

The Plan provides for the payment of Administrative Expenses and Claims of creditors. Administrative Expenses and priority tax Claims are not classified.  The Plan divides all other prepetition Claims and equity interests into six (6) classes.  The Claims of creditors are classified and treated as follows:

1.  Class 1. Class 1 consists of the Allowed Claim of United Development Funding Land Opportunity Fund, L.P. United Development is unimpaired. United Development shall be paid monthly payments of interest only from the DIP Loan Proceeds in accordance with the terms of the DIP Loan Documents and will be paid the full amount of its Allowed secured Claim from the first Net Sale Proceeds in accordance with the terms of the DIP Loan Documents. The principal amount of the DIP Loan is $4,220,000.

2.  Class 2. Class 2 consists of the Allowed secured Claim of Point Center Financial, Inc. Point Center Financial is impaired. The payment default on the Point Center Financial loan shall be cured *nunc pro tunc* to the Petition Date by extending the maturity date of the loan to a date which is eighteen months after the Effective Date. Point Center Financial shall retain its lien on the Real Property in the same order of priority that existed on the Petition Date, except for the super-priority lien of United Development and unless the Bankruptcy Court equitably subordinates its lien. When a Unit is sold, the lien of Point Center Financial on the sold Unit shall be released and shall attach to the Net Sale Proceeds of the Unit in the same order of priority that existed prior to the sale of the Unit or as otherwise determined by the Bankruptcy Court. Point Center has filed a proof of claim asserting a claim in the amount of $13,261,915.76. The Point Center claim is disputed.

The Allowed Secured Claim of Point Center Financial shall accrue interest from and after the Petition Date at Point Center Financial's contract rate of eleven and one-half percent (11.5%) per annum. Unless decisions of the Bankruptcy Court require otherwise, Point Center Financial shall receive the Net Sale Proceeds remaining after the Class 1 Claim is paid in full until the Allowed Class 2 secured Claim of Point Center Financial is paid in full.

In the event that the Bankruptcy Court determines that the holders of Class 3 Claims have liens that are higher in priority than the lien of Point Center Financial, or if the Bankruptcy Court equitably subordinates the lien of Point Center Financial, Point Center Financial shall receive the Net Sale Proceeds in accordance with the order of priority determined by the Bankruptcy Court.

In the event that the Class 2 Claim is a Disputed Claim, the Reorganized Debtor shall pay to Point Center Financial an amount equal to the undisputed portion of its secured Claim as provided above and shall hold in a segregated account Net Sale Proceeds equal to the disputed portion of the Claim. Point Center Financial shall have a lien on the segregated account until the Disputed Claim is resolved .

3.  Class 3. Class 3 consists of the holders of Allowed Mechanics' Lien Claims. Class 3 is impaired. Each holder of a Class 3 Claim shall retain its lien on the Real Property in the same order of priority that existed on the Petition Date, except for the super-priority lien of United Development. When a Unit is sold, the liens of Class 3 Claimants on the sold Unit shall be released and shall attach to the Net Sale Proceeds of the Unit in the same order of priority that existed prior to the sale of the Unit.

Unless decisions of the Bankruptcy Court require otherwise, each holder of a Class 3 Claim shall receive a pro rata portion of the Net Sale Proceeds remaining after the Class 1 and Class 2 Claims are paid in full until the Allowed Class 3 Claims are paid in full. The Class 3 claimants will not receive post-petition interest under the Plan.

In the event that the Bankruptcy Court determines that the holders of Class 3 Claims have liens that are higher in priority than the lien of Point Center Financial, or if the Bankruptcy Court equitably subordinates the lien of Point Center Financial, each holder of a Class 3 Claim shall receive a pro rata portion of the Net Sale Proceeds in accordance with the order of priority determined by the Bankruptcy Court.

In the event that a Class 3 Claim is a Disputed Claim, the Reorganized Debtor shall pay the Class 3 Claimant an amount equal to the undisputed portion of its Class 3 Claim and shall hold in a segregated account Net Sale Proceeds equal to the disputed portion of the Claim. The holder of the Disputed Claim shall have a lien on the Net Sale Proceeds in the segregated account until the Disputed Claim is resolved.  A list of the Class 3 Claims is set forth in Exhibit "C" thereto.

The Plan does not provide for post-petition interest on the Class 3 Claims. The Mechanic's Lienholder Committee has asserted that the Class 3 claimants are entitled to interest under applicable bankruptcy law. The Debtor does not believe that is necessarily true because the entitlement to interest depends upon the value of the collateral securing the claims and the amount of senior liens on the collateral. Both of those factors are uncertain in this case. In any event, the Debtor has worked hard to provide the best chance of recovery to all creditors. The Debtor's principals have worked with the subcontractors to complete the building and prevent foreclosure by the senior secured creditor. The Debtor's principals have also incurred additional financial obligations and contributed funds to the chapter 11 reorganization effort in order to get the subcontractors paid. In exchange, they are asking the subcontractors to make this small concession regarding interest. Other classes of creditors are also being asked for concessions. The Debtor believes that it is in the best interests of the mechanic's lienholders to vote to accept the Plan.

4. Class 4. Class 4 consists of the Allowed secured Claim of Del Toro Holdings.  Class 4 is impaired. The payment default on the Del Toro Holdings loan shall be cured *nunc pro tunc* to the Petition Date by extending the maturity date of the loan to a date which is eighteen months after the Effective Date. Del Toro Holdings shall retain its lien on the Real Property in the same order of priority that existed on the Petition Date, except for the super-priority lien of United Development. When a Unit is sold, the lien of Del Toro Holdings on the sold Unit shall be released and shall attach to the Net Sale Proceeds of the Unit in the same order of priority that existed prior to the sale of the Unit.

The Allowed secured Claim of Del Toro Holdings shall accrue interest from and after the Petition Date at the rate of ten percent (10%) per annum. Del Toro Holdings shall receive the Net Sale Proceeds remaining after the Class 1, Class 2, and Class 3 Claims are paid in full until the Allowed Class 4 Claim is paid in full. In the event that the Bankruptcy Court equitably subordinates the lien of Point Center Financial, Del Toro Holdings shall receive the Net Sale Proceeds in accordance with the order of priority determined by the Bankruptcy Court.

In the event that the Class 4 Claim is a Disputed Claim, the Reorganized Debtor shall pay to Del Toro Holdings an amount equal to the undisputed portion of its Secured Claim and shall hold in a segregated account Net Sale Proceeds equal to the disputed portion of the Claim. Del Toro Holdings shall have a lien on the segregated account until the Disputed Claim is resolved.  Del Toro has filed a proof of claim asserting a claim in the amount of $1,549,714.61.

5. Class 5. Class 5 consists of Allowed unsecured Claims.  Each holder of an Allowed Class 5 Claim shall receive a pro rata portion of the Net Sale Proceeds, if any, remaining after the Class 1, Class 2, Class 3, Class 4, Administrative Claims, and post-confirmation expenses are paid in full, plus

9

a pro rata share of any net proceeds from the Lender Liability Claims, if any, until the Allowed Class 5 Claims are paid in full. A list of the Class 5 Claims is set forth in Exhibit "D" thereto.

6. Class 6. Class 6 consists of the holders of equity interests in the Debtor. The Debtor's equity holders shall retain their interests in the Reorganized Debtor provided that all creditors are paid in accordance with the terms of this Plan.

D. Payment of Administrative Expenses.

Administrative Claims are not classified under the Plan. Each holder of an Allowed Administrative Claim that has not been satisfied during the Case shall be paid in full from the Net Sale Proceeds remaining after the Class 1, Class 2, Class 3, and  Class 4 Claims are paid in full.

The administrative claims are expected to be comprised of the legal fees and costs of the Debtor's attorneys and the legal fees and costs of the attorneys for the Official Committee of Lien Holder Claimants. As of July 1, 2009, the unpaid administrative expenses were approximately $440,961. The Debtor estimates that the administrative expenses on the Effective Date will be approximately $550,000.

The Bankruptcy Code provides that administrative expenses must be paid in full on the effective date of the plan unless the administrative claimants agree to a different treatment. In this case, the estate will not have funds on the Effective Date of the Plan with which to pay the administrative expenses. The Debtor's assets are encumbered by the liens of various secured creditors. Secured creditors are usually entitled to be paid first from the proceeds of their collateral. Administrative claims are unsecured claims. Therefore, unless the Bankruptcy Court orders otherwise, the administrative claimants would not be entitled to be paid from the sale of the Debtor's property until the secured creditors have been paid. The Debtor expects that the administrative claimants will agree to not have their claims paid in full on the Effective Date of the Plan because preventing confirmation and causing the case to be converted to a chapter 7 case would not be in the best interests of the administrative claimants. Causing the case to be converted to a chapter 7 would probably result in the chapter 11 administrative fees not being paid at all. It would not result in those claims being paid any faster than they would be paid under the Plan.

Under certain circumstances, a secured creditor's collateral may be surcharged for the payment of certain costs of preserving the collateral. Certain administrative expenses incurred in this case resulting in a significant improvement to the value of the collateral held by the secured creditors. The Debtor reserves the right to bring a motion before the Bankruptcy Court to surcharge the collateral of the secured creditors other than United Development to pay some or all of the administrative claims.

E. Executory Contracts.

The Debtor does not believe that there are any executory contracts or unexpired leases. However, if any executory contracts or unexpired leases do exist, they shall be rejected as of the Effective Date. Any individual or entity holding a Claim based upon the rejection of an executory contract or unexpired lease pursuant to this Article must, within thirty days after Confirmation, file a proof of claim with the Bankruptcy Court.  Such Claims shall be treated as Class 5 Claims unless the Bankruptcy Court orders otherwise.  The failure of any such individual or entity to file a proof of claim within the specified time period will result in the disallowance of such Claim.

F. Means for Implementing the Plan.

1. Introduction.

This is a liquidating plan of reorganization. When the Debtor filed its bankruptcy petition on May 27, 2008, the Luxury Condominium Building was only partially completed. During the course of

this bankruptcy case, the Debtor borrowed additional construction funds and completed the building. The City of San Diego issued a Certificate of Occupancy on July 6, 2009. Now the Debtor is in the process of selling the Units.

As the Units are sold, the sale proceeds will be used to pay creditors' claims as provided in the Plan. First, the post-petition lender, United Development, will be paid. Then the other secured creditors will be paid in the order of their priority as established by the Bankruptcy Court. Once the secured claims are paid in full, the administrative claims will be paid. When all senior classes of claims are paid in full, the unsecured creditors will be paid. Lastly, the equity holders will receive all property of the estate after all classes of creditors have been paid in full.

The extent to which a particular class will be paid will depend upon the available sale proceeds remaining after all senior classes have been paid in full. It is not possible to predict with certainty the prices at which the Units will be sold. The Debtor will use its best efforts to obtain the highest prices that the market will bear within the eighteen months following the Effective Date. However, there is always the risk that there will not be sufficient sales proceeds to pay all creditors in full. Attached hereto as Exhibit "B" is a chart showing the Units for sale and the listing price for each Unit.

2.    Future Management Team.

The Reorganized Debtor will be managed Joseph Martinez and Anthony Cutri who are both insiders of the Debtor. Mr. Martinez and Mr. Cutri are architects and the principals of Martinez + Cutri Corporation which they formed in 1980. They have received national recognition for projects that they designed including, without limitation, Prospect Point, La Jolla; The Career Center at UCSD, La Jolla; Hyatt Regency Hotel Expansion, San Diego; Chula Vista Nature Interpretive Center; Chavez Elementary School; City Heights Urban Village; and DOMA Lofts and Townhomes. Messrs. Martinez and Anthony Cutri also received numerous architectural awards over the years for their projects, including: Progressive Architecture Award, Orchid Award, San Diego, Chula Vista Beautification Awards, Awards from the American Institute of Architects, and Awards from the American Planning Association. Since 2005, Martinez + Cutri Corporation has been the recipient of nineteen prizes in design competitions, including ten First Awards.

a)    Joseph Martinez.

Joseph Martinez received his Master of Architecture degree from Harvard University in 1975 and his Bachelor of Arts degree from the University of California at San Diego in 1971. He is a founding principal of Martinez + Cutri Corporation with headquarters in San Diego; since its inception in 1980, he has directed the firm's educational and resort divisions.

Some of his award-winning projects include Cesar Chavez Elementary and Rancho del Rey Middle School, as well as the Logan Heights Library. Other educational facilities include San Ysidro High School, along the international border (Mexico-USA), Otay Ranch High School in a new planned residential community, and in the inner-city, the new Lincoln High School. Some of his planning projects include the Oceanside Strand Master Plan (APA and AIA Award recipient) and Bosque de las Aracarias, Mexico. His housing projects include Fort Mac Arthur Family Housing for the United States Air Force, San Pedro; Canterbury Court, Chula Vista; Cedar Road Apartments, Vista; and Morena Vista TOD mixed-use development. Moreover, his resort projects include: The Millennium, Seaport Tower, Ritz-Carlton Harbor Island and San Diego Marriott Tower Three; his Grand Hyatt Regency Hotel along the San Diego Embarcadero has recently been completed. Currently, he is designing two luxury hotels in downtown San Diego.

In addition to his private practice, Mr. Martinez taught architecture and urbanism from 1978 to 1993 at the University of California, Berkeley, San Diego State University, University of California, San Diego, and The New School of Architecture. He has participated in various forums, symposia and lectures, including programs by the AIA, CEFPI and was a member of the jury for American Schools & Universities. In 2001, he was the Program Chair for the AIA/Committee on Architectural Education and National School Board Association Conference on "Sustainable Schools: Sustainable Communities". Recently, two of his school projects were published in "AIA: Exemplary Learning Environments." Similarly, he has served on a numerous boards and commissions, including a gubernatorial appointee to the San Diego Regional Government Efficiency commission, Qualcomm Stadium Advisory Board, NTC Arts & Culture Foundation, the San Diego Dialogue, the Mariachi Foundation, and CONVIS. In 1984, Mr. Martinez was named UCSD's Alumni of the Year, and in 1985 he was named Centennial Alumni. Most recently, California Rural Legal Assistance, Inc. awarded him The Jessie de la Cruz Lifetime Community Service Award at their 2005 San Diego Tardeada Event.

b) <u>Anthony Cutri</u>.

Anthony Cutri received his Master of Architecture degree from U.C. Berkeley, College of Environmental Design, and his Bachelor of Arts degree from the University of California at San Diego. He is a founding principal of Martinez + Cutri Corporation with headquarters in San Diego; since its inception in 1980, he has directed the firm's housing and urban design divisions. He is a registered architect in the States of California and Nevada, and is NCARB certified.

Mr. Cutri has practiced architecture in the Bay Area, New York City, and San Diego. His previous project experience includes the Chula Vista Nature Center (received a San Diego AIA Orchid Award), Alfred Alquist State Office Building (won a PA Awards Design Citation), and UC Lawrence/Berkeley Labs Master Plan.

His housing experience with M+C includes The Mark, DOMA, M2i, Fahrenheit, Montefaro, Cortez Blu, City Walk, Village Walk, Celagio, Oceanside Transit-Oriented Development, Juhl (Las Vegas) and the City Heights Urban Village. Tony's educational facility experience includes Academy of Our Lady of Peace, St. Augustine High School and Adult Education Facilities in National City, Imperial Beach, and City Heights. His office building experience consists of Bonita Professional Plaza, Centre Medical Plaza, Third and Alvarado, Third and H, Eighth and Broadway, Mission Valley Heights, and City Heights. His urban design experience includes the City Heights Urban Revitalization Plan, the Fenton Industrial Park Master Plan, and the Little Italy Visionary Plan.

In addition to his private practice, Mr. Cutri has taught undergraduate and graduate architecture, urban design and planning at the University of California, Berkeley; the University of Texas, Austin; Columbia University, New York; the New School of Architecture, San Diego and the University of California, San Diego. He serves as a Commissioner on the Board of Architectural Examiners for the State of California.

3. <u>Future Sales Team</u>.

The marketing and sales of the Units will be performed by Pacific Pinnacle Real Estate Services. George Gilman, co-founder and President of Pacific Pinnacle, is a real estate broker with significant depth and breadth of experience. Mr. Gilman's 25 years of professional experience includes residential, commercial and hotel development and sales. He is a Phi Beta Kappa and holds an MBA from the University of California, Berkeley Business School. Along with his co-founder, Dale Burgett, Mr. Gilman has had significant experience and success in selling high-end condominium units along the

12

Sixth Avenue corridor where Mi Arbolito's property is located. Mr. Gilman and Mr. Burgett sold approximately 75% of the condominium units in the Park Laurel buildings located at Sixth Avenue and Laurel Street. The Park Laurel condominiums are similar to the Mi Arbolito condominiums in that they are luxury condominiums located on the edge of Balboa Park. Mi Arbolito is expected to appeal to a similar market as Park Laurel.

The listing agreement with Pacific Pinnacle provides for a broker's fee of 5.25% of the purchase price.

4. <u>Marketing Plan</u>.

Attached hereto as Exhibit 'E' is an outline and schedule of the Debtor's marketing plan. When the construction of the building was completed, a decision was made not to complete the final finishes in most of the Units. The Debtor believed that most of the buyers would want different custom finishes that what was built for the model unit. Therefore, certain finishes such as kitchen counters and flooring were left uncompleted. As each unit is sold, the buyer will specify the finishes that they want. The finishes that are in the model are included in the listed purchase price. Purchasers who choose to have the Debtor build out different finishes than those in the model will be given an allowance towards the finishes that they choose. The allowance will be $51,860 for the 1st floor, $50,857 for the 2nd floor, and $67,025 for floors 5 thru 15. The purchases will be responsible for paying the cost of the upgrades in full, over the allowance amount, before the work commences. If a purchaser wants to purchase a unit and do a custom floor plan/finish layout, Martinez + Cutri Architects will work with them to design the improvements, complete the construction documents, permit the work, and build it for them. The purchaser would get the same allowances as discussed above, but would have to pay Martinez + Cutri Architects architectural fees in the amount of 10% of the additional construction cost. The fees and the full price of the upgrades would have to be paid before the work commenced..

G. <u>Determination of Claims</u>.

The Bankruptcy Court established a claims bar date of October 31, 2008. Approximately twenty-one proofs of claim were filed. Approximately 29 creditors recorded mechanic's liens against the Debtor's property. Of those, 15 did not file proof of claim and 11 were not scheduled by the Debtor. The Debtor has asked for additional information from the mechanic's lien holders and is in the process of analyzing the claims in order to determine the correct amounts of the claims, which claimants have enforceable mechanics lien claims, and which claim overlap with other mechanic's lien claims. Summaries of the claims in Class 3 and Class 5 are attached hereto as Exhibits 'C' and 'D' respectively.

IV. <u>LIQUIDATION ANALYSIS</u>

When evaluating the terms of the Plan, each creditor should weigh various alternatives for payment.  One alternative to the Plan is the liquidation of all of the estate's assets, through a proceeding under chapter 7 the Bankruptcy Code.  If the Debtor's case was converted to a case under chapter 7 of the Bankruptcy Code, a chapter 7 trustee would be appointed and would liquidate all of the Debtor's assets and distribute the proceeds to the creditors.

This is a liquidating plan. At best, the sale proceeds would be the same in a chapter 7 case. At worst, a chapter 7 trustee could choose not market the Units individually in which case the sale proceeds would be less. There would be an extra layer of administrative expenses in a chapter 7 case due to the fees paid to the trustee. However, the chapter 11 case also has an additional layer of administrative expenses due to the existence of the Official Committee of Lien Holders which exists in the chapter 11, but would not exist in a chapter 7. Accordingly, the Debtor believes that creditors will receive more

13

under the Plan than they would if the case was converted to a case under chapter 7.

## V.  ADDITIONAL SOURCES OF INFORMATION

Additional sources of information available to all creditors include the various schedules and reports which were filed by the Debtor in accordance with the provisions of Bankruptcy Code.  These include, without limitation, the "Chapter 11 Statement of Financial Affairs for Debtor Engaged In Business," Schedules and monthly operating reports for all periods from May 2008 to the present.  The schedules and operating reports described above are available for inspection and review by the public in the office of the Clerk of the United States Bankruptcy Court located at 325 West F Street, San Diego, California during regular business hours (Monday - Friday, 9:00 a.m. to 4:00 p.m.).

## VI.  VOTING INSTRUCTIONS AND CONFIRMATION PROCEDURES

A.  Voting Procedure.

Bankruptcy is a type of creditor democracy.  The Plan divides the Claims of Creditors and Equity Interest holders into six (6) separate classes.  Only impaired classes of creditors are entitled to vote on the Plan.  As a general rule "impaired classes" include creditors who, under the Plan, will not receive payment in full of their Claims on the Effective Date of the Plan.  In this case, Classes 2, 3, 4, 5 and 6 are impaired. Class 1 is unimpaired and is deemed to have accepted the Plan.

All creditors entitled to vote on the Plan must cast their vote by completing, dating and signing the "Ballot," which is enclosed with this Disclosure Statement.  When fully executed, the Ballot must be mailed to Alan Vanderhoff, Esq., 750 'B' Street, Suite 1620, San Diego, California 92101 such that it is received not later than 5:00 p.m. (PDT) on August 21, 2009.  A vote rejecting the Plan may be changed to a vote accepting the Plan anytime prior to the conclusion of the confirmation hearing by providing notice of the change to counsel for the Debtor.

B.  Confirmation of Plan/Solicitation of Acceptances.

This Disclosure Statement has been approved by the Bankruptcy Court in accordance with Section 1125 of the Bankruptcy Code and is provided to each person whose Claim or Equity Interest has been scheduled by the Debtor or who has filed a proof of Claim or Equity Interest with respect to the Debtor or its property, and to the Debtor.  The Disclosure Statement is intended to assist creditors in evaluating the Plan and determining whether to accept the Plan.

In determining acceptance of the Plan, votes of creditors will only be counted if submitted by a creditor whose Claim is duly scheduled by the Debtor as undisputed, non-contingent and liquidated, or who has filed with the Court a proof of Claim or proof of interest to which no objection has been filed.

C.  Hearing on Confirmation of Plan.

The Court has set September 18, 2009, at 10:00 a.m., in Department Three (3) of the Bankruptcy Court as the time, date and place for the hearing to determine whether the Plan has been accepted by the requisite number of creditors and whether the other requirements for confirmation of the Plan have been satisfied.  Each creditor will receive, with this Disclosure Statement, a Notice of Hearing on Confirmation of the Plan which gives the details of that hearing and a date by which objections to the confirmation of the Plan, if any, must be filed.  That hearing may be continued from time to time by announcements made by the Bankruptcy Court in open session at the hearing without any further written notice being provided to you.  Your attendance at the hearing on Confirmation of the Plan is encouraged.

14

D.  <u>Acceptances Necessary to Confirm Plan</u>.

At the scheduled hearing, the Court must determine, among other things, whether the Plan has been accepted by each impaired class.  Under Section 1126 of the Code, an impaired Class of Claims is deemed to have accepted the Plan upon a favorable vote of at least two-thirds in (dollar) amount and more than one-half in number of the Allowed Claims of Class members voting on the Plan.  Further, unless there is unanimous acceptance of the Plan by an impaired class, the Court must also determine that Class members will receive at least as much as they would if the Debtor was liquidated under chapter 7 of the Code.  The Debtor believes that the Plan satisfies this requirement as to each Class.

E.  <u>Confirmation of the Plan Without Necessary Acceptances</u>.

The Plan may be confirmed even if it is not accepted by one or more of the impaired classes, if the Court finds that the Plan does not discriminate unfairly against and is "fair and equitable" as to each dissenting class.  This provision is generally set forth in Section 1129(b) of the Bankruptcy Code.  Generally, that section requires a showing that the Claims in such Class either will receive the full value of the Claim or, if they receive less, no Class with junior liquidation priority may receive anything.  With respect to a class of unsecured Claims, the term "fair and equitable" in section 1129(b) means that the Plan provides that each holder of a Claim of such class receive or retain on account of such Claim property of a value, as of the effective date of the Plan, equal to the allowed amount of such Claim, or that the holder of any Claim or interest that is junior to the Claims of such class will not receive or retain any property under the Plan on account of such junior Claim or interest. Section 1129(b) is a relatively flexible, yet very complex provision, and this summary is not intended to be a complete statement of the law.  You should consult your own legal counsel for a full understanding of your rights and the Debtor's powers under that section.

Please take notice that if one or more classes of impaired Claims fail to accept the Plan the Debtor presently intends to request confirmation of the Plan notwithstanding the non-acceptance of that class pursuant to the provisions of Bankruptcy Code section 1129(b).

F.  <u>Plan Amendments at Confirmation Hearing</u>.

The provisions of the Bankruptcy Code give the Debtor substantial power to amend and alter provisions of the Plan up to and including the time of the Confirmation Hearing.  The provisions of the Plan regarding technical and curative amendments are particularly significant because they permit the Debtor to propose and implement any number or type of amendments to the Plan for the purpose of neutralizing or curing an actual or claimed defect in the Plan asserted by the Bankruptcy Court or any party-in-interest.  This right extends additionally to any amendments which are made to respond to or neutralize any objections to the Plan previously advanced by any party-in-interest.

By its terms, the Plan does not require any prior written notice of such technical and/or curative amendment to be given to any creditor or party-in-interest.  The only requirement for notice of such modification is that the modification be disclosed in open session of the confirmation hearing.  Unless you attend all sessions of the confirmation hearing, you may not have the opportunity to object to such changes.

In addition to the foregoing, the provisions of the Bankruptcy Code vest the Bankruptcy Court with substantial power and discretion to effectively modify (in ways which may be favorable or unfavorable) the rights and benefits which various parties may receive under the Plan by superimposing various conditions or other requirements as part of its Order of Confirmation.  No prior notice of any provisions that the Court may insert in its Order of Confirmation will be given to any party-in-interest

except to the extent that such intentions are disclosed in open session of the Bankruptcy Court.  Here again, your failure to attend any session of the Confirmation Hearing might mean you will not have the opportunity to object to or otherwise be heard as to potential amendatory provisions to the Plan (if any) which the Court decides to insert in its Order of Confirmation.

All parties-in-interest are encouraged to personally attend every session of the confirmation hearing.  Only by such attendance can parties be assured of obtaining notice and an opportunity to be heard on all amendatory provisions which may affect their rights under the Plan.

VII.    <u>TAX CONSEQUENCES</u>

The Debtor is not offering tax advice to any creditor and this Disclosure Statement should not be considered to contain any specific advice or instruction considering the tax treatment of any Claim or interest.  Each creditor is urged to consult with its own legal, accounting or other advisor concerning the tax treatment of its Claim or any distribution from or on behalf of the Debtor pursuant to the Plan or otherwise.

VIII.    <u>SOLICITATION OF ACCEPTANCES OF THE PLAN</u>

The Debtor believes that the Plan will provide the best distribution that is possible in this case.  The Debtor urges you to vote to accept the Plan.  To accept or reject the Plan, the enclosed Ballot must be returned to the place and by the time specified on the Ballot.

July 24, 2009                          VANDERHOFF LAW GROUP

                                       /s/ Alan Vanderhoff
                                  By: _____
                                       Alan Vanderhoff
                                  Attorneys for MI ARBOLITO, LLC

16

VANDERHOFF LAW GROUP
Alan Vanderhoff, Cal. Bar No. 138032
Jeanne C. Vanderhoff, Cal. Bar No. 138011
750 B Street, Suite 1620
San Diego, California  92101
Telephone: (619) 299-2050

Attorneys for MI ARBOLITO, LLC

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| In re: | ) BK. No. 08-04553-LT11 |
| | ) |
| MI ARBOLITO, LLC, | ) DEBTOR'S FIRST AMENDED PLAN OF |
| | ) REORGANIZATION DATED APRIL 10, 2009 |
| Debtor. | ) |
| | ) Date:    September 18, 2009 |
| | ) Time:    10:00 a.m. |
| | ) Dept.    Three |
| | ) Judge:   Hon. Laura S. Taylor |
| | ) |

        MI ARBOLITO, LLC, debtor and debtor-in-possession in the above-captioned bankruptcy case, through its attorney, Alan Vanderhoff, hereby proposes this plan of reorganization.

## ARTICLE 1

### Definitions

        1.01    "Administrative Expense" means any cost or expense of administration of the Debtor's Chapter 11 bankruptcy case entitled to priority in accordance with the provisions of sections 503(b) and 507(a)(1) of the Bankruptcy Code.

        1.02    "Allowed" when used in reference to a Claim means (i) a Claim against the Debtor, proof of which was timely filed, as to which no objection has been interposed; or (ii) if no proof of Claim has been filed, but the Claim has been scheduled by the Debtor as liquidated in amount and not disputed or contingent, as to which no objection has been interposed; or (iii) a Claim as to which any objection has been interposed, to the extent such Claim has been Allowed in whole or in part by a Final Order.

        1.03    "Bankruptcy Code" means title 11 of the United States Code.

        1.04    "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of California or, in the event of a withdrawal of the reference, the United States District Court for the Southern District of California.

Exhibit A

1.05    "Claim" means any right to payment from the Debtor, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or any right to an equitable remedy for breach of performance if such breach gives rise to a right of payment from the Debtor, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

1.06    "Confirmation Order" means a Final Order of the Bankruptcy Court confirming this Plan.

1.07    "Contested Claim" means any Claim that is not an Allowed Claim.

1.08    "Debtor" means Mi Arbolito, LLC.

1.09    "DIP Loan" means the post-petition loan to the Debtor from United Development approved by the Bankruptcy Court by an order entered on December 23, 2008 and secured by a super-priority lien on the Real Property.

1.10    "DIP Loan Documents" means the loan documents that evidence the DIP Loan.

1.11    "DIP Loan Proceeds" means the proceeds of DIP Loan.

1.12    "Disputed Claim" means a claim to which an objection has been filed and which has not been determined by a final, non-appealable order of the Bankruptcy Court.

1.13    "Distribution Date" when used with respect to an Allowed Claim, means the later of (i) the Effective Date, and (ii) the date upon which the Claim becomes an Allowed Claim.

1.14    "Effective Date" means the first business day that is more than 15 days after the Confirmation Order becomes a Final Order.

1.15    "Final Order" means an order or judgment of a court of competent jurisdiction, including the Bankruptcy Court and the United States District Court for the Southern District of California, which is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending.

1.16    "Lender Liability Claim" means the Debtor's claims against Point Center Financial including, without limitation, claims for fraud, interference with economic advantage, breach of contract, and equitable subordination.

1.17    "Luxury Condominium Building" means the 14 story, luxury condominium development currently under construction on the Real Property.

1.18    "Mechanic's Lien Claims" means Claims for which a valid and perfected mechanic's lien exists on the Real Property under applicable law.

1.19    "Net Sale Proceeds" means the proceeds from the sale of Units after brokers' fees and other customary costs of sale.

1.20    "Plan" means this Chapter 11 plan for the Debtor, as it may be modified from time to time, and all exhibits and schedules thereto.

1.21    "Real Property" means the real property owned by the Debtor and located at 3415 Sixth Avenue, San Diego, California.

1.22    "Reorganized Debtor" means the Debtor after the entry of a Confirmation Order.

1.23    "Units" means individual condominium units in the Real Property.

Exhibit A

ARTICLE 2

Payment of Administrative Expenses and Real Property Tax Claims

2.01    Administrative Expenses.  Administrative Expenses Allowed pursuant to Bankruptcy Code sections 503(b)(1) and 507(a)(1) (and not previously paid), shall be paid in full from the Net Sale Proceeds remaining after the Class 1, Class 2, Class 3, and  Class 4 Claims are paid in full.

2.02    Real Property Taxes.  Real property taxes due and payable on or before the Confirmation Date shall be paid from the DIP Loan Proceeds on or before the Confirmation Date.

ARTICLE 3

Classification of Claims and Equity Interests

3.01    Class 1.  Class 1 consists of the Allowed Claim of United Development Funding Land Opportunity Fund, L.P. ("United Development").

3.02    Class 2.  Class 2 consists of the Allowed secured Claim of Point Center Financial, Inc.

3.03    Class 3.  Class 3 consists of the holders of Allowed Mechanics' Lien Claims.

3.04    Class 4.  Class 4 consists of the Allowed secured Claim of Del Toro Holdings.

3.05    Class 5.  Class 5 consists of Allowed unsecured Claims.

3.06    Class 6.  Class 6 consists of the holders of equity interests in the Debtor.

ARTICLE 4

Treatment of Claims

4.01    Class 1–United Development.  United Development is unimpaired. United Development shall be paid monthly payments of interest only from the DIP Loan Proceeds in accordance with the terms of the DIP Loan Documents and will be paid the full amount of its Allowed secured Claim from the first Net Sale Proceeds in accordance with the terms of the DIP Loan Documents.

4.02    Class 2–Point Center Financial.  Point Center Financial is impaired. The payment default on the Point Center Financial loan shall be cured *nunc pro tunc* to the Petition Date by extending the maturity date of the loan to a date which is eighteen months after the Effective Date. Point Center Financial shall retain its lien on the Real Property in the same order of priority that existed on the Petition Date, except for the super-priority lien of United Development and unless the Bankruptcy Court equitably subordinates its lien. When a Unit is sold, the lien of Point Center Financial on the sold Unit shall be released and shall attach to the Net Sale Proceeds of the Unit in the same order of priority that existed prior to the sale of the Unit or as otherwise determined by the Bankruptcy Court.

The Allowed Secured Claim of Point Center Financial shall accrue interest from and after the Petition Date at Point Center Financial's contract rate of eleven and one-half percent (11.5%) per annum. Unless decisions of the Bankruptcy Court require otherwise, Point Center Financial shall receive the Net Sale Proceeds remaining after the Class 1 Claim is paid in full until the Allowed Class 2 secured Claim of Point Center Financial is paid in full.

In the event that the Bankruptcy Court determines that the holders of Class 3 Claims have liens that are higher in priority than the lien of Point Center Financial, or if the Bankruptcy Court equitably subordinates the lien of Point Center Financial, Point Center Financial shall receive the Net Sale Proceeds in accordance with the order of priority determined by the Bankruptcy Court.

Exhibit A

In the event that the Class 2 Claim is a Disputed Claim, the Reorganized Debtor shall pay to Point Center Financial an amount equal to the undisputed portion of its secured Claim as provided above and shall hold in a segregated account Net Sale Proceeds equal to the disputed portion of the Claim. Point Center Financial shall have a lien on the segregated account until the Disputed Claim is resolved.

4.03    Class 3–Mechanics' Liens.  Class 3 is impaired. Each holder of a Class 3 Claim shall retain its lien on the Real Property in the same order of priority that existed on the Petition Date, except for the super-priority lien of United Development. When a Unit is sold, the liens of Class 3 Claimants on the sold Unit shall be released and shall attach to the Net Sale Proceeds of the Unit in the same order of priority that existed prior to the sale of the Unit.

Unless decisions of the Bankruptcy Court require otherwise, each holder of a Class 3 Claim shall receive a pro rata portion of the Net Sale Proceeds remaining after the Class 1 and Class 2 Claims are paid in full until the Allowed Class 3 Claims are paid in full.

In the event that the Bankruptcy Court determines that the holders of Class 3 Claims have liens that are higher in priority than the lien of Point Center Financial, or if the Bankruptcy Court equitably subordinates the lien of Point Center Financial, each holder of a Class 3 Claim shall receive a pro rata portion of the Net Sale Proceeds in accordance with the order of priority determined by the Bankruptcy Court.

In the event that a Class 3 Claim is a Disputed Claim, the Reorganized Debtor shall pay the Class 3 Claimant an amount equal to the undisputed portion of its Class 3 Claim and shall hold in a segregated account Net Sale Proceeds equal to the disputed portion of the Claim. The holder of the Disputed Claim shall have a lien on the Net Sale Proceeds in the segregated account until the Disputed Claim is resolved.

4.04    Class 4–Del Toro Holdings.  Class 4 is impaired. The payment default on the Del Toro Holdings loan shall be cured *nunc pro tunc* to the Petition Date by extending the maturity date of the loan to a date which is eighteen months after the Effective Date. Del Toro Holdings shall retain its lien on the Real Property in the same order of priority that existed on the Petition Date, except for the super-priority lien of United Development. When a Unit is sold, the lien of Del Toro Holdings on the sold Unit shall be released and shall attach to the Net Sale Proceeds of the Unit in the same order of priority that existed prior to the sale of the Unit.

The Allowed secured Claim of Del Toro Holdings shall accrue interest from and after the Petition Date at the rate of ten percent (10%) per annum. Del Toro Holdings shall receive the Net Sale Proceeds remaining after the Class 1, Class 2, and Class 3 Claims are paid in full until the Allowed Class 4 Claim is paid in full. In the event that the Bankruptcy Court equitably subordinates the lien of Point Center Financial, Del Toro Holdings shall receive the Net Sale Proceeds in accordance with the order of priority determined by the Bankruptcy Court.

In the event that the Class 4 Claim is a Disputed Claim, the Reorganized Debtor shall pay to Del Toro Holdings an amount equal to the undisputed portion of its Secured Claim and shall hold in a segregated account Net Sale Proceeds equal to the disputed portion of the Claim. Del Toro Holdings shall have a lien on the segregated account until the Disputed Claim is resolved.

4.05    Class 5–General Unsecured Creditors.  Each holder of an Allowed Class 5 Claim shall receive a pro rata portion of the Net Sale Proceeds, if any, remaining after the Class 1, Class 2, Class 3, Class 4, Administrative Claims, and post-confirmation expenses are paid in full, plus a pro rata share of

4

any net proceeds from the Lender Liability Claims, if any, until the Allowed Class 5 Claims are paid in full.

    4.06    Class 6–Equity Holders.  The Debtor's equity holders shall retain their interests in the Reorganized Debtor provided that all creditors are paid in accordance with the terms of this Plan.

ARTICLE 5

Means for Implementing the Plan

    5.01    Sale of Units. The Debtor will sell the Units. The proceeds from the sale of the Units will be used to make payments under the Plan.

    5.02    Reorganized Debtor Power and Authority. Subject to the provisions of the Plan, the Reorganized Debtor may administer, manage, operate, or liquidate all property, contractual interests, setoffs, and recoupments of the estate and may prosecute or settle any and all causes of action of any type not otherwise disposed of by the Plan.

    Without limiting any other power or authority granted to the Reorganized Debtor hereunder, the Reorganized Debtor shall have the power and authority to (1) prosecute, settle, compromise, and/or dismiss any of the causes of action owned by the bankruptcy estate, (2) manage and protect the estate and distribute the net proceeds as specified herein, (3) grant options to purchase, enter into contracts to sell, and sell the assets of the estate or any part or parts thereof on such terms as it shall deem appropriate in its independent business judgment, (4) release convey, assign, or sell any right, title, or interest in or about the estate, (5) pay and discharge any costs, expenses, fees, or obligations deemed necessary to preserve the estate, (6) purchase insurance to protect the estate, the Reorganized Debtor, and their agents and professionals from liability, (7) deposit funds and draw checks and make disbursements thereof, (8) employ and compensate brokers to help sell property of the estate, (9) file and prepare tax returns on behalf of the estate, (10) take any action required or permitted by this Plan,  (11) employ attorneys, accountants, brokers, and other professionals, as it deems necessary to assist it in performing its duties as Reorganized Debtor, and compensate such persons pursuant to the Plan, (12) settle, compromise, or adjust by arbitration or otherwise, any disputes or controversies in favor of or against the estate subject to approval of the Bankruptcy Court, (13) abandon property of the estate pursuant to section 554 of the Bankruptcy Code, (14) waive or release rights of any kind, and (15) cause the Debtor to be dissolved.

    5.03    Distributions.  The Reorganized Debtor may make any number of interim distributions as it deems appropriate. Distributions shall be made to the addresses contained in the proofs of claim filed by such holders or the last known address of such holders.  Checks issued by the Reorganized Debtor shall be null and void if not cashed within ninety days of the date of issuance thereof.  If any distribution is returned as undelivered, no further distributions to such holder shall be made unless and until the Reorganized Debtor is notified of such holder's then current address, at which time all missed distributions shall be made to such holder without interest.  Amounts with respect to undeliverable distributions made by the Reorganized Debtor shall be returned to the Reorganized Debtor until such distributions are claimed.  All Claims for undeliverable distributions shall be made on or before the second anniversary of the Effective Date.  After such date, all unclaimed property shall be deemed property of the Reorganized Debtor and no longer subject to the terms of the Plan, and all Claims against the Reorganized Debtor shall be forever barred.

    5.04    Reserve. Prior to making distributions to particular classes, the Reorganized Debtor shall reserve sufficient cash for the payment of (1) all estimated post-confirmation expenses of the

5

Exhibit A

Reorganized Debtor and its agents, (2) all Claims in senior classes, and (3) Contested Claims in senior classes and Contested Claims in the class receiving the distribution.  No reserve shall be established for any contingent Claim in the absence of a Final Order requiring such reserve.  If a contingent Claim becomes fixed and absolute, the holder of such contingent Claim shall receive distributions pursuant to section 502(j) of the Bankruptcy Code, to the extent the Claim may otherwise be Allowed.  In the event a contingent Claim is entitled to distributions pursuant to section 502(j) of the Bankruptcy Code, such Claim shall receive pro rata distribution in the proportion it bears to all other Allowed Claims of the same Class.

 5.05 <u>Post-confirmation Compensation of Reorganized Debtor's Professionals</u>.  The Reorganized Debtor's professionals shall be entitled to compensation and reimbursement of expenses.  The Reorganized Debtor's professionals may invoice the Reorganized Debtor directly on a monthly basis and also serve a copy of the invoice on the Office of the United States Trustee.  In the event no objection to payment of an invoice is filed and served on the Reorganized Debtor and the billing professional by the Office of the United States Trustee within fifteen (15) days of service of the invoice and the Reorganized Debtor does not otherwise object to payment of the invoice, the Reorganized Debtor may pay such invoice without further order of the Court from non-estate property or from Net Sale Proceeds provided that all secured claims have been paid in full; <u>provided further however</u>, that in the event an objection is timely filed and served on the Reorganized Debtor and the billing professional or in the event of a dispute between the Reorganized Debtor and the professional, the professional may submit an application for payment to the Court, and the Court retains jurisdiction to hear such applications and enter appropriate orders thereon.

 5.06 <u>Approval of Settlements</u>.  Court approval for compromises entered into by the Reorganized Debtor shall be obtained pursuant to the Notice of Intended Action procedure set forth in Bankruptcy Local Rule 2002-2.

## ARTICLE 6

### Executory Contracts and Unexpired Leases

 6.01 <u>All Contracts and Leases Rejected</u>.    All executory contracts and unexpired leases shall be rejected as of the Effective Date.

 6.02 <u>Bar to Rejection Damages</u>.  Any individual or entity holding a Claim based upon the rejection of an executory contract or unexpired lease pursuant to this Article must, within thirty days after Confirmation, file a proof of claim with the Bankruptcy Court.  Such Claims shall be treated as Class 5 Claims unless the Bankruptcy Court orders otherwise.  The failure of any such individual or entity to file a proof of claim within the specified time period will result in the disallowance of such Claim.

## ARTICLE 7

### Procedures for Resolving and Treating Contested and Contingent Claims

 7.01 <u>Objection Deadline</u>.  Objections to Claims, whether filed by the Debtor, the Reorganized Debtor or creditors, must be filed not later than 90 days following the Effective Date.  This section shall not limit parties' rights to object to Claims, if any, filed or amended after the Effective Date, or to seek an extension of the time to object to Claims for cause shown.

Exhibit A

7.02    <u>Time for Filing Administrative Claims</u>.  Administrative Claims against the Debtor, other than the applications of court-approved professionals, must be filed within thirty days following the entry of an order confirming the Plan.

ARTICLE 8

Miscellaneous Provisions

8.01    <u>Modification of Plan</u>.  Modifications of the Plan may be proposed in writing by the Debtor at any time before confirmation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with section 1125 of the Bankruptcy Code.  The Plan may be modified at any time after confirmation and before its substantial consummation, provided that the Plan, as modified, meets the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.  A holder of a Claim or equity interest that has accepted or rejected the Plan shall be deemed to have accepted or rejected, as the case may be, such Plan as modified, unless, within the time fixed by the Bankruptcy Court, such holder changes its previous acceptance or rejection.

8.02    <u>Revocation of Plan</u>. The Debtor reserves the right to revoke and withdraw the Plan prior to entry of the order confirming the Plan.  If the Debtor revokes or withdraws the Plan, or if confirmation of the Plan does not occur, then the Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other person or to prejudice in any manner the rights of the Debtor or any person in any further proceedings involving the Debtor.

8.03    <u>Cramdown</u>.  The Debtor requests the Bankruptcy Court to confirm the Plan pursuant to the provisions of section 1129(b) of the Bankruptcy Code with respect to any Class that is deemed not to have accepted the Plan and any Class that fails to accept the Plan.

8.04    <u>Post-Confirmation Reports</u>.  The Reorganized Debtor shall file quarterly post-confirmation reports with the Bankruptcy Court until the case is closed and shall serve copies of such reports on the Office of the United States Trustee.  Post-confirmation fees, if any, shall be paid on a timely basis.

ARTICLE 9

Jurisdiction of the Bankruptcy Court

9.01    The Bankruptcy Court shall retain jurisdiction to the fullest extent permitted by law.


July 24, 2009                          VANDERHOFF LAW GROUP


                                            /s/ Alan Vanderhoff
                                    By: _____
                                            Alan Vanderhoff
                                    Attorneys for MI ARBOLITO, LLC


7

Exhibit A

# Mi Arbolito

## Price List

October 1, 2008

| | |
|---|---|
| Floor  100 | $1,300,000.00 |
| Floor  200 | $1,200,000.00 |
| Floor  300 | $1,400,000.00 |
| Floor  400 | $1,500,000.00 |
| Floor  500 | $1,600,000.00 |
| Floor  600 | $1,700,000.00 |
| Floor  700 | $1,850,000.00 |
| Floor  800 | $2,000,000.00 |
| Floor  900 | $2,200,000.00 |
| Floor  1000 | $2,300,000.00 |
| Floor  1100 | $2,400,000.00 |
| Floor  1200 | $2,550,000.00 |
| Floor  1250 | $2,625,000.00 |
| Penthouse | $2,800,000.00 |

*Disclaimer:   Price List and prices are subject to change without notice.*

EXHBIT "B"

**CLASS 3 CLAIMS**

| Creditor Name | POC Amount | Scheduled Amount | Recorded Lien Amount | Estimated Amount |
|---|---|---|---|---|
| Able Patrol and Guard | $47,775.38 | $39,600.00 | $45,071.95 | |
| Dynalectric Company | $485,721.90 | $284,213.00 | $1,232,989.45 | |
| Paul Hansen Equipment | $26,358.00 | $26,358.00 | $26,358.00 | |
| Industrial Fire Sprinkler Co., Inc. | $18,368.92 | $17,110.00 | $17,110.92 | |
| General Electric | $144,445.75 | $89,944.00 | $144,445.75 | |
| Landmark Hospitality Contracting | $732,782.10 | $334,765.00 | $677,108.76 | |
| Morrow Equipment Company | $93,755.83 | $41,268.00 | $52,487.71 | |
| Brady Company San Diego | $1,338,559.13 | $1,168,311.00 | $1,280,917.83 | |
| AO Reed & Company | $391,539.71 | $249,150.00 | $391,539.71 | |
| Division 8, Inc. | 475,000.00 | $368,166.00 | $475,000.00 | |
| Hanson Aggregate West, Inc. | $88,083.58 | $97,333.00 | $88,083.58 | |
| Applied Waterproofing Technology, Inc. | 0 | $38,409.00 | $37,111.10 | |
| Arcadia,Inc. | 0 | $41,957.00 | $41,957.85 | |
| Atlas Construction | 0 | $20,245.00 | $15,463.00 | |
| Brewer Crane | 0 | $60,514.00 | $54,030.00 | |
| Painters Unlimited California | 0 | $12,879.00 | $12,564.00 | |
| T.M. Structural | 0 | $713,661.00 | $713,661.46 | |
| Diamond Environmental Services | 0 | 0 | $2,993.40 | |
| Interior Specialists, Inc. | $113,113.58 | 0 | $113,113.88 | |
| LTD Sheet Metal, Inc. | $115,500.00 | 0 | $115,499.91 | |

EXHIBIT "C"

| Creditor Name | POC Amount | Scheduled Amount | Recorded Lien Amount | Estimated Amount |
|---|---|---|---|---|
| Commercial & Industrial Roofing | 0 | 0 | $94,190.00 | |
| Sunstate Equipment Co. | 0 | 0 | $4,500.00 | |
| Daily Disposal Services, Inc. | 0 | 0 | $9,230.30 | |
| C&L Concrete Cutting | 0 | 0 | $1,540.00 | |
| Commercial Scaffolding of California | 0 | 0 | $68,262.81 | |
| Minshew Brothers Steel Const., Inc. | 0 | 0 | $93,297.12 | |
| Pacific Western Millworks | 0 | 0 | $35,009.97 | |
| OJ Insulation, LP | 0 | 0 | $1,385.00 | |
| TOTAL: | $4,071,003.88 | $3,603,883.00 | $5,844,923.46 | |

Zero indicates that proof of claim was not filed or claim was not scheduled.

Note: Estimated Amounts will be updated prior to hearing on disclosure statement.

EXHIBIT "C"

### CLASS 5 CLAIMS

| Creditor Name | POC Amount | Scheduled Amount | Estimated Amount |
|---|---|---|---|
| 1700 Investors, LLC<br>750 B Street, Suite 1740<br>San Diego, CA. 92101 | 0.00 | $607,000.00 | $607,000.00 |
| Jeffrey Brown Photography<br>630 N. Crescent Ct.<br>San Diego, CA 92103 | 0.00 | $7,500.00 | $7,500.00 |
| John M. Turner, Esquire<br>Turner & Maasch, Inc.<br>550 West C Street, Ste 1150<br>San Diego, CA 92101 | 0.00 | $14,509.00 | $14,509.00 |
| Seltzer Caplan McMahon Vitek<br>750 B Street, Suite 2100<br>San Diego, CA 92101 | 0.00 | $296,860.00 | $296,860.00 |
| V. Frank Asaro, Esquire<br>Law Offices of V. Frank Asaro<br>4370 La Jolla Village Dr., Ste. 400<br>San Diego, CA 92122 | 0.00 | $14,980.00 | $14,980.00 |
| Golden Construction<br>PO Box 926<br>Pagosa Springs, CO 81147 | $5,080.00 | $9,830.00 | $5,080.00 |
| Supply Network dba Viking Supplynet<br>2353 International St.<br>Columbus, OH 43228 | 0.00 | $9,789.00 | 0.00 |
| Silvergate Investments, Inc.<br>c/o Tom Coffman<br>2311 Palo Danzante<br>Alpine, CA 92910 | 0.00 | $1,015,625.00 | 0.00 |
| TOTAL: | | | $945,929.00 |

Zero indicates that proof of claim was not filed or claim was not scheduled.

EXHIBIT "D"

 **PACIFIC PINNACLE**
REAL ESTATE SERVICES



# *Mi Arbolito*

## Sales and Marketing Launch Schedule

| | |
|---|---|
| Listing agreement to be fully executed | DONE |
| Closet organizers to be installed | DONE (need stone) |
| Model unit to be cleaned and detailed and punched | June 9 |
| Up light for balcony palm | DONE |
| Interior of model unit to be photographed (stage shot w/people) | DONE |
| Design/Order For Sale Banners | DONE |
| Order Flags | DONE |
| Area stock shots of Balboa Park and Bay Views/DT | DONE |
| Enter properties into MLS | 10 of14 DONE |
| Enter properties on websites/3 rd party portals | DONE |
| Lights on timer in model | DONE |
| Update Floor Plan | DONE |
| Create registration cards | DONE |
| Create business cards for development | DONE |
| Building exterior to be detailed | Ongoing wrap June 9 |
| Exterior building photography (models/high end vehicle) | DONE |
| View photography (check hi res pano) and secure night view (full moon ???) | DONE |
| Negotiate New Construction 5 year Home Warranty Policy premium | DONE |
| Explore Dream Homes/Premier/Distinctive Homes and negotiate rates | DONE |
| Consider GLT ad if we can get editorial | Pending |
| Explore possible Fitness Center rates to be ready if needed | Pending |
| Revamp brochure/marketing materials (hold 11x17 four panel format w/inserts) | DONE |
| Review and recommend modifications to Mi Arbolito website | Ongoing |
| Design direct mail teaser piece | DONE |

Exhibit "E"

Order marketing materials once approved     (Need delivery by June 11)                    DONE
Certificate of Occupancy to be issued                                                     June 10 (ADA)
Immerse into condo docs and prepare talking points                                        Now – June 10
Prepare selling talking points                                                            DONE
Scope jumbo financing sources                                                             Now – June 15
Order Natural Hazard Report                                                               DONE
Meet ISI team                                                                             DONE
Assemble critical docs binder (CCR, Condo Plan, Floor Plan, Standard Finishes, DRE White Report,     80% Done Need DRE
          HOA Budget, Developer Bios, Natural Hazard Report, Dec sheet for Master Insurance)
Delivery Lobby painting                                                                   June 9
Lay out proposed print media schedule for July forward                                    Ongoing
Schedule sales and marketing events:

          Schedule Pac Pinn office tour and DETAILED briefing                             June 17 day
          Top Producer Sunset Reception                                                   June 17 eve
          Brokers Open for 92101                                                          June 18
          Brokers Open for 92103                                                          June 19
          Public Grand Opening week                                                       June 20 - 27
          Minnie's Client List/Park Laurel Owners/Del Prado Home Owners/Pacific Pinnacle Master Client List     June 24 and July 1
          Possible channel 10 news coverage                                               June 24 or July1
Press Releases                                                                            June 18
Sunday Public Open Houses                                                                 June 21 on
Email blasts                                                                    June 17, July 15, Aug 15
First analysis of sales/marketing results/strategies/revamp requirements/new opportunities/lost opportunities     July 15
Showing by appointment only                                                               Ongoing

Redact
ed

UPDATED 5/31/09 FGG

Exhibit "E"